ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Lockheed Martin Aeronautics Company | ) | ASBCA Nos. 63621, 63622, 63671 |
| | | 63697, 63698, 63742 |
| | ) | |
| Under Contract No. N00019-15-C-0003 | ) | |

APPEARANCES FOR THE APPELLANT:  Erin N. Rankin, Esq.
Catherine O. Shames, Esq.
Jessica R. Chao, Esq.
  Crowell & Morning LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Samuel W. Morris, Esq.
  DCMA Chief Trial Attorney
Srikanti Schaffner, Esq.
Debra E. Berg, Esq.
  Trial Attorneys
  Defense Contract Management Agency
  Carson, CA

OPINION BY ADMINISTRATIVE JUDGE MELNICK DENYING
CROSS-MOTIONS FOR SUMMARY JUDGMENT

Lockheed Martin Aeronautics Company (Lockheed) appeals from multiple contracting officer final decisions disallowing indirect costs and demanding payment of $98 million.  The government says Lockheed breached the clauses of its contracts requiring the use of domestic air and ocean transportation services.  It claims the costs of foreign-flag transportation Lockheed included in indirect overhead pools were unallowable.  Lockheed seeks a summary judgment ruling that the clauses do not apply to international shipping it has charged as indirect costs.  The government cross moves for summary judgment, seeking a ruling that all of Lockheed's international shipping costs for the relevant fiscal years were incurred in violation of the clauses and are therefore unallowable.  We deny both motions.

<u>STATEMENT OF FACTS AND LEGAL PROVISIONS FOR PURPOSES OF
THE MOTION</u>

Lockheed's customers include the government, non-U.S. governments, and commercial companies (stip. ¶ 13).[1]  During Lockheed's 2016 through 2019 fiscal years, it had contracts with the government that incorporated FAR 52.216-7, Allowable Cost and Payment; 52.247-63, Preference for U.S.-Flag Air Carriers (FAA clause); and DFARS 252.247-7023, Transportation of Supplies by Sea (CPA clause) (stip. ¶ 1).  For purposes of its claims, the government has designated the representative contract identified above.  It is a fixed-price incentive/firm-fixed price contract for the acquisition of long lead-time items for the F-35 aircraft program, as well as the production of those aircraft.  (Stip. ¶ 12)  The representative contract incorporates the June 2003 FAA clause and the April 2014 CPA clause (stip. ¶ 12; R4, tab 5 at 55, 82).[2]  All citations are to those versions.

Paragraph (b) of the FAA clause observes that section 5 of the International Air Transportation Fair Competitive Practices Act of 1974 (the Fly America Act, currently codified at 49 U.S.C. § 40118) requires agencies, contractors, and subcontractors to use U.S.-flag air carriers for government financed international air transportation of personnel or property, to the extent available.[3]  It says that in the absence of satisfactory proof of the necessity for foreign-flag transportation, the Comptroller General must disallow expenditures established for the account of the United States for international air transportation secured aboard a foreign-flag air carrier if a U.S.-flag carrier is available.  FAR 52.247-63(b).  Accordingly, paragraph (c) of the clause requires the following from the contractor:  "If available, the Contractor, in performing work under this contract, shall use U.S.-flag carriers for international air transportation of personnel (and their personal effects) or property."  FAR 52.247-63(c).  Paragraph (d) states that in the event a contractor selects a carrier other than a U.S.-flag air carrier for international air transportation, "the Contractor shall include a statement on vouchers involving such transportation" declaring the

---

[1] "Stip." refers to the Stipulated Questions of Law, Material Facts, and Applicable Law, submitted by the parties on August 15, 2024.

[2] There is no indication that any of the alternate CPA clauses are intended so we deem the basic clause to have been incorporated.

[3] In pertinent part, the Act requires government components to "take necessary steps to ensure that the transportation of passengers and property by air is provided by" a U.S.-flag carrier if the component "obtains the transportation . . . in carrying out an arrangement under which payment is made by the Government" and "the air carrier is available, if the transportation is between a place in the United States and a place outside the United States; or reasonably available, if the transportation is between 2 places outside the United States."  49 U.S.C. § 40118(a).

2

unavailability and providing reasons. It supplies language to be used declaring the lack of availability or need to use foreign-flag service that refers to FAR 47.403. FAR 52.247-63(d). FAR 47.403 announces guidelines for implementation of the Fly America Act established by the Comptroller General. FAR 47.403-3 provides additional elaboration regarding the voucher requirement. Paragraph (a) of that provision states: "Agencies shall disallow expenditures for U.S. Government-financed commercial international air transportation on foreign-flag air carriers unless there is attached to the appropriate voucher a memorandum adequately explaining why service by U.S.-flag air carriers was not available, or why it was necessary to use foreign-flag air carriers." Paragraph (b) provides when the traveler "fails to use available U.S-flag air carrier service, the amount to be disallowed against the traveler is based on the loss of revenues suffered by U.S-flag air carriers" under a provided formula. Paragraph (e) of the FAA clause requires inclusion of its substance in each subcontract or purchase "under this contract that may involve international air transportation." FAR 52.247-63(e).

While not directly relevant to the costs in dispute, in 1997, Lockheed Martin Corporation and the government's Corporate Administrative Contracting Officer executed a Memorandum of Understanding (MOU) applying to all Lockheed segments, stating the Fly America Act requirements "apply only to airplane travel for direct personnel performing direct work on covered contracts." The Act's "requirements do not apply to indirect personnel or indirect travel by direct personnel." (Stip. ¶¶ 14-15) On April 25, 2019, the government's contracting officer declared it was withdrawing from the MOU as of July 1 of that year, stating the signatories to the MOU had "misinterpreted the regulations" (stip. ¶ 16).

DFARS subpart 247.5 implements the Military Cargo Preference Act of 1904, codified at 10 U.S.C. § 2631. DFARS 247.570. It dictates that "[i]n accordance with 10 U.S.C. § 2631(a) DOD contractors shall transport supplies exclusively on U.S.-flag vessels," with provisions for obtaining a waiver. DFARS 247.572(a). Accordingly, it requires inclusion of the CPA clause in contracts. DFARS 247.574. Paragraph (b)(1) of the basic CPA clause requires the following performance from the contractor: "The Contractor shall use U.S.-flag vessels when transporting any supplies by sea under this contract," while paragraph (b)(2) imposes a similar but more limited requirement upon subcontractors. DFARS 252.247-7023(b). Paragraph (a) provides a broad definition of supplies, to include all property, excluding land or interest in land, "that is clearly identifiable for eventual use by or owned by the DOD at the time of transportation by sea." Supplies include, but are not limited to, "public works; buildings and facilities; ships; floating equipment and vessels of every character, type, and description, . . . machine tools; material; equipment; stores of all kinds; end items; construction materials; and components of the foregoing." DFARS 252.247-7023(a). Paragraph (c) provides a mechanism to request authorization from the contracting officer to ship on foreign-flag vessels when the contractor believes U.S.-flag vessels are not available for timely shipment, freight charges are inordinately excessive or unreasonable, or they are

higher than charges to private persons for like goods. DFARS 252.247-7023(c). Paragraph (d) dictates submission of the request at least 45 days prior to the necessary sailing date with a description about the shipment and efforts to secure U.S.-flag vessels. DFARS 252.247-7023(d). Paragraph (e) requires the contractor provide a bill of lading to the contracting officer and Maritime Administration within 30 days after each shipment covered by the clause. DFARS 252.247-7023(e). For contracts exceeding the simplified acquisition threshold, paragraph (f) mandates a representation with the contract's final invoice that no ocean transport was used in the contract's performance, or only U.S.-flag vessels were used for all ocean shipments under the contract, or the contracting officer consented to all foreign-flag transport. DFARS 252.247-7023(f). Paragraph (g) gives notice that if foreign-flag vessels are used without authorization, the contracting officer can equitably adjust the contract. DFARS 252.247-7023(g). Paragraph (h) requires flow down of the substance of the clause to subcontracts. DFARS 252.247-7023(h).

Though the representative contract is not among them, Lockheed and the government are party to cost-reimbursement or time and materials contracts containing the Allowable Cost and Payment clause (stip. ¶¶ 2, 12). Noteworthy here is paragraph (a), which provides for payments in amounts determined to be allowable by the contracting officer in accordance with FAR subpart 31.2 in effect on the date of the contract and the terms of the contract. FAR 52.216-7(a).

Lockheed's Cost Accounting Standards Disclosure Statements identify separate indirect cost pools known as the Fort Worth Manufacturing, Marietta Manufacturing, Palmdale Manufacturing, and Engineering (app. R4, tab 21 at 63-65, tab 22 at 55-57, tab 23 at 55-57). Lockheed describes the Fort Worth, Marietta, and Palmdale pools to include "the indirect cost of departments whose efforts are utilized primarily in the manufacturing effort or in support of the manufacturing effort at" each location. Each includes a broad array of department costs, expressly including "shipping." Lockheed "[i]ncludes the indirect cost of departments required for the performance and support of engineering tasks" in the Engineering pool, though it does not expressly include shipping among its elements. (*Id*) The government does not object to the classifications (gov't mot. at 2). Consistent with its disclosure statements, Lockheed's fiscal year 2016 and 2017 final indirect cost rate proposals submitted in accordance with the Allowable Cost and Payment clause included shipping in the Fort Worth, Marietta, and Palmdale Manufacturing overhead indirect cost pools. Lockheed's fiscal year 2018 and 2019 final indirect cost rate proposals included shipping in the Fort Worth, Marietta, and Engineering overhead indirect cost pools. (Stip. ¶ 4)

In a series of final decisions issued in 2023, government contracting officers disallowed Lockheed's indirect costs contained in its 2016 through 2019 final indirect cost rate proposals and demanded payment based upon unilaterally established rates. The grounds pertinent here were that Lockheed was not in compliance with the FAA

4

and CPA clauses because it included costs for the transportation of cargo on non-U.S. carriers or vessels and therefore costs included in the indirect overhead pools were unallowable pursuant to FAR 31.201-2(a)(4). (Stip. ¶¶ 5-11) The decisions followed three government audits questioning specific cost amounts pursuant to the FAA and CPA clauses (R4, tabs 22, 29, 32).

Lockheed has appealed the government final decisions disallowing $128 million of indirect costs and demanding payment from Lockheed of more than $98 million (compl. ¶ 5). Counts I and III of Lockheed's consolidated complaint contend the FAA and CPA clauses do not apply to indirect costs of international air or ocean transport (compl. ¶¶ 194-220, 227-45).[4] Lockheed requests summary judgment upon Counts I and III (app. mot. at 1). The government cross moves for summary judgment, seeking a determination that all of Lockheed's international transport of cargo costs for fiscal years 2016 to 2019 were incurred in violation of the FAA and CPA clauses and are therefore unallowable under FAR 31.201-2(d) (gov't mot. at 3).

<u>DECISION</u>

When both parties have moved for summary judgment, each party's motion must be considered on its own merits and all reasonable inferences resolved against the party whose motion is under consideration. *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003).

I.      Lockheed's Motion

Lockheed seeks a categorical ruling through summary judgment that as a matter of law under no scenario do the performance requirements of the FAA and CPA clauses apply to international shipping activities it has treated as indirect costs. Determining the meaning of a contract starts with its language. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)). "When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning . . . ." *Id.* The same is true for a contract clause imposed by the FAR, such as the FAA and CPA provisions incorporated into Lockheed's contracts. Their interpretation is also a question of law. *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986); *Charleston Marine Containers, Inc. v. GSA*, CBCA No. 1834, 10-2 BCA ¶ 34,551 at 170,398.

---

[4] The remaining counts are not the subject of this motion.

A.       The FAA Clause

The substance of the FAA clause begins with a description in paragraph (b) of the mandate of the Fly America Act, which it says "requires that all Federal agencies and Government contractors and subcontractors use U.S.-flag air carriers for U.S. Government-financed international air transportation" to the extent available. FAR 52.247-63(b).  It does not itself spell out contractual terms.  Those are contained in paragraph (c), which dictates that Lockheed "in performing work under this contract, shall use U.S.-flag carriers for international air transportation" if available. FAR 52.247-63(c).  This language is unambiguous.  When performing work under a contract containing the clause, Lockheed must use available U.S.-flag carriers for international air transportation.

Lockheed believes that designating its international shipping costs as indirect relieves it from the FAA clause's performance requirement because the FAR defines an indirect cost as one "not directly identified with a single, final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective."  FAR 2.101; *see also* FAR 31.203(b).  Lockheed has considerable freedom in how it classifies its costs so long as it is consistent.  *See ATK Thiokol, Inc. v. United States*, 598 F.3d 1329, 1332 (Fed. Cir. 2010).  Lockheed notes that final cost objectives are often the government contracts themselves (app. mot. at 11).  Because the FAA clause requires use of U.S.-flag carriers for international shipping associated with the particular contract containing the clause, Lockheed suggests it does not apply if Lockheed indirectly spreads its shipping charges across more than one contract, especially when some of its other contracts are with non-governmental entities. It maintains that "any transportation that generates indirect costs is outside the [clauses's] scope" because it was not "'used' in 'performing work under' any particular contract that includes the FAA Clause."  (App. mot. at 10, 13)

Lockheed cannot so easily nullify the mandate of the FAA clause.  The word "cost" is nowhere to be found in it.  Its unambiguous language imposes contract performance requirements upon Lockheed, and when appropriate, its subcontractors. Compliance with the clause is determined by whether Lockheed's international air transportation in performing work under a contract incorporating the clause is with an available U.S.-flag carrier.  The requirement is neither concerned with, nor dependent upon, how Lockheed accounts for its costs or charges for them.  Lockheed is correct that by limiting its application to "this contract," the clause excludes from its required performance international air transportation performed exclusively for other, non-government contract related purposes.  That Lockheed indirectly apportions some of the cost of shipping performed for government contracts containing the clause to contracts that are not so constrained, or to an intermediate cost pool, does not relieve it from the clause's obligations.  In this context, spreading its costs is irrelevant to how it is to perform its government contracts.

6

Central to Lockheed's position is its contention that by characterizing shipping as an indirect cost it has established that it only benefits Lockheed, or it simultaneously benefits multiple customers, contracts, or projects, including non-government customers (app. opp'n at 12). Lockheed has not proffered any evidence that might prove that contention. For all we know, Lockheed has flown equipment and materials internationally to or from the relevant facilities that is solely to perform under multiple government contracts that all contain the FAA clause, and not for any other purpose. Lockheed's position is that even then it is free to ignore the FAA clause's performance requirement and use international air carriers because the transportation is for more than one contract and is charged indirectly. (Tr. 30-34) However, Lockheed concedes the clause applies if the transportation is only for a single government contract, though it has not shown it ever charges shipping as a direct cost (app. opp. at 4). So, if Lockheed has one contract containing the clause to build 10 aircraft and arranges an international shipment of materials to perform work under it, Lockheed agrees it must comply with the clause. But if it is building the same 10 aircraft through 10 contracts, all containing the clause, the same shipment need not comply because Lockheed is charging for the transportation indirectly. It is nonsensical for the clause to apply when the transportation is for one contract containing the clause, but not if the shipment is for more than one that all contain it. Every item shipped is in performance of work under at least one contract containing the clause. We fail to discern anything in the clause granting Lockheed such relief from its performance obligations. This scenario is sufficient by itself to deny Lockheed the categorical ruling it seeks that the clause can never apply to transportation charged indirectly.

Nor do we believe it matters if only some of the relevant contracts for which the shipment is conducted are with the government. If Lockheed shipped property internationally to perform work under any contract containing the clause, then its terms apply to the shipment of that property. Nothing in the clause suggests Lockheed would be relieved of that obligation because a non-government contract, or Lockheed itself, also benefitted from the shipping. We are unpersuaded that Lockheed can escape the clause's performance obligations by simply adding some unrelated items to a shipment otherwise arranged for the performance of work under contracts containing the clause.

Lockheed also purports to bolster its position by arguing that transporting property can never constitute performance of work under any government contract unless it contains a contract line item expressly requiring the transportation, which it suggests it treats as a direct cost. It says otherwise transportation merely "enables" performance which does not require compliance with the FAA clause. (Tr. 18, 26-27, 45, 115-16) Lockheed has not presented evidence that when the relevant facilities commission a single international air shipment for multiple government contracts expressly requiring international air transportation of materials, they treat the shipment

as a direct cost. Regardless, we disagree with the premise. To perform a contract means to comply with its terms and conditions. *See Def. Integrated Sols., LLC v. United States*, 165 Fed. Cl. 352, 375 (Fed. Cl. 2023). "Failure to perform a contractual duty when it is due is a breach of contract." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000) (quoting *Winstar Corp. v. United States*, 64 F.3d 1331, 1545 (Fed. Cir. 1995), *aff'd.*, 518 U.S. 839 (1996)). We can easily conceive of contracts that include terms, conditions, or duties that can only be successfully performed by transporting certain items internationally but do not expressly discuss transportation or contain a line item for it. Transportation is bound up in performing the contract. If Lockheed's failure to transport the items caused it not to perform it would be in breach. Given that failure to transport is a breach of contract, engaging in it is performing work under the contract. We perceive the clause to apply to scenarios just like this.

Lockheed's reliance upon *ATK Thiokol* is misplaced. That case involved whether certain costs had been properly classified under the FAR and Cost Accounting Standards as indirect independent research and development (IR&D) costs, or whether they were not and had to be charged directly to one commercial contract. 598 F.3d at 1331-35. The court of appeals held that the FAR's definition of IR&D costs excludes "costs that are specifically required by the contract." *Id.* at 1335. Lockheed suggests the decision dictates that the FAA clause's application to shipments that are "performing work under this contract" is limited to transportation that specifically relates to a single, existing contract and excludes shipments that support multiple contracts. Relatedly, Lockheed contends that any time it properly classifies the costs of a shipment as indirect, the shipment could not have been to perform work under a contract containing the clause. (App. mot. at 13) Interesting as *ATK Thiokol* is for the body of cost accounting law distinguishing between direct and indirect costs, it has nothing to do with the FAA clause or the performance obligations it imposes upon Lockheed. As noted, they are not determined by whether Lockheed must charge its shipping costs to one contract, or can spread the costs to others, but by whether Lockheed used available U.S.-flag air carriers for international shipping performed under a contract containing the clause. *ATK Thiokol* does not support Lockheed's suggestion that by classifying the costs of shipping materials or equipment as indirect, as a matter of law no portion of the shipment can be in performance of work under a contract containing the FAA clause. Nor are we inclined to make such a sweeping ruling. Whether any specific shipment includes work performed under a Lockheed contract containing the clause requires review of its particular facts and the terms of the contract. This motion lacks the evidence to address those issues.

Lockheed's arguments become more cryptic when it turns to paragraph (d) of the FAA clause. That provision mandates that when a contractor does not retain a U.S.-flag air carrier for international air transportation, "the Contractor shall include a statement on vouchers involving such transportation" declaring the unavailability and

providing reasons. FAR 52.247-63(d). As best we can discern, Lockheed complains that subjecting it to the FAA clause when it has characterized its shipping as an indirect cost would be inconvenient because anytime it does not use a U.S.-flag carrier it will have to provide a statement of unavailability on every payment voucher it submits to the government for all of its contracts that incorporate its indirect cost rate. It suggests that multiple contracting officers would then be involved in determining under FAR 47.403-3(b) whether it failed to use an available U.S.-flag carrier for a particular shipment and how much to disallow. (App. mot. at 18-19) It implies such a process is untenable. The government denies Lockheed must include the statement on all regular payment vouchers, suggesting it need only be included on more specific international air transportation vouchers required by the FAA clause.

We are skeptical that paragraph (d) applies as Lockheed suggests. Notably, it has not proffered any evidence that the government has implemented it as it contends. Furthermore, the clause's text does not apply to all payment vouchers but only to "vouchers involving" international air transportation on a non-U.S.-flag air carrier. FAR 52.247-63(d). Also, FAR 47.403-3(a), which is cited in paragraph (d)'s required notification language, only requires an explanatory memorandum with the "appropriate voucher," which is singular, when foreign-flag transportation is used. It is evident from the language and context of paragraph (d) and FAR 47.403-3(a) that the intent is to notify the government of the use of a foreign-flag carrier for a shipment. It would be pointless to require Lockheed to repeat the notification hundreds or even thousands of times. Anyway, we need not resolve this issue because neither the type or number of vouchers to be employed for reporting non-U.S.-flag transportation under paragraph (d), the cost of reporting, nor the process the government might implement to determine disallowance, informs our construal of the express performance requirement of paragraph (c) of the FAA clause, dictating that when performing work under a contract containing the clause, Lockheed must use available U.S.-flag carriers for international air transportation.

Lockheed also contends that paragraph (e)'s requirement that it include the FAA clause's substance in subcontracts "that may involve air transportation" also proves it applies only to work charged as direct costs (app. mot. at 20). FAR 52.247-63(e). We fail to grasp why that would be. We conclude the intent of paragraph (e) is plain from its text and is unrelated to how the prime contractor accounts for its costs.

Lockheed additionally advances a reading of the Fly America Act itself that it says confirms its position. The Act requires use of a U.S.-flag air carrier for the transportation of property when a government component is "carrying out an arrangement under which payment is made by the Government." 49 U.S.C. § 40118(a)(1)(A). According to Lockheed, "carrying out an arrangement" equates to "carrying out the *explicit* requirements of a contract" which it contends is logically limited to "transportation . . . obtained for direct performance of an individual contract

9

pursuant to which the U.S. Government will pay for that transportation as a direct cost" (app. mot. at 15-16). The Act is simply not that restricted. The FAA clause unambiguously pronounces the meaning of the Act, stating it "requires that all . . . Government contractors . . . use U.S.-flag air carriers for U.S. Government-financed international air transportation . . . of property" to the extent available. FAR 52.247-63(b); *see also* H.R. Rep. No. 93-1475 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7461, 7466 (explaining in legislative history pertaining to the original enactment of the FAA that when foreign air transportation of property is paid for by the government that air transportation should be furnished by United States air carriers).[5] Nothing in this description supports exempting international air transport simply because Lockheed charges for it indirectly. When Lockheed treats the costs of transportation as indirect, they are still financed by the government through its payment of indirect cost rates that are based upon those costs. Hence the Act's performance requirements apply.

Lockheed next departs from the FAA clause entirely and directs us to the "Rights in Other Than Commercial Computer Software and Other Than Commercial Computer Software Documentation" clause, located at DFARS 252.227-7014. That unrelated software rights provision defines software developed exclusively at private expense to include that which was developed at costs charged to indirect cost pools. If not developed exclusively or partially at private expense it is defined to have been developed exclusively with government funds. DFARS 252.227-7014(a). Lockheed implies that if software is not considered developed with government funds if charged as an indirect cost, air transportation cannot be government-financed if charged that way either (app. mot. at 21-22). However, the express definitions contained in DFARS 252.227-7014 were promulgated by the Department of Defense to specifically define terms "[a]s used in [the] clause" as part of an overarching scheme governing its software rights. DFARS 252.227-7014(a); *see Boeing Co.*, ASBCA No. 60373, 18-1 BCA ¶ 37,112 at 180,624-26. Lockheed has failed to cite any precedent extending those definitions beyond the scope of the DFARS clause to which they apply, and certainly not to the FAR's separate and distinct government wide application of the FAA. *See also* FAR 2.101 (containing definitions generally applicable throughout the FAR).

Separately, Lockheed suggests the 1997 MOU, where the parties agreed the Fly America Act "applied only to airplane travel for direct personnel performing direct work on covered contracts," is pre-dispute evidence that the government interpreted the FAA clause not to apply to international shipping of cargo charged as indirect costs (app. mot. at 23). The government later withdrew from that arrangement, saying it had previously "misinterpreted the regulations." Lockheed does not suggest the FAA

---

[5] Although the cited report refers to originally enacted language of the Act, Lockheed correctly notes subsequent changes to the language were not intended to alter the substantive meaning (*see* app. mot. at 23).

10

clause is ambiguous, and we find it is not. We therefore "follow its plain meaning without considering extrinsic evidence" such as the MOU about personal travel or the government's withdrawal from it. *P.K. Mgmn't Grp. v. Sec. of Housing and Urban Dev.*, 987 F.3d 1030, 1033 (Fed. Cir. 2021). The plain meaning requires Lockheed to use available U.S.-flag carriers for all international air transportation when performing work under a contract containing the clause, regardless of how Lockheed charges for it. Moreover, to the extent the MOU conflicts with this FAR clause's mandate, the contracting officer lacked authority to execute it. *See Sec'y of Def. v. Pratt & Whitney*, 160 F.4th 1224, 1233-34 (Fed. Cir. 2025).

### B. The CPA Clause

The CPA clause is similarly clear. It says Lockheed "shall use U.S.-flag vessels when transporting any supplies by sea under this contract." DFARS 252.247-7023(b)(1). Generally, supplies are property "clearly identifiable for eventual use by or owned by the DOD at the time of transportation by sea." DFARS 252.247-7023(a). Lockheed can seek relief if U.S.-flag service is not timely available, freight charges are excessive or unreasonable, or higher than rates charged to private persons. DFARS 252.247-7023(c); *Charleston Marine Containers,* 10-2 BCA ¶ 34,551 at 170,398. Lockheed correctly observes that "under this contract" refers to the contract incorporating the clause. Like the FAA clause, Lockheed maintains that the clause's only reasonable interpretation is that it "applies to transportation when the costs for that transportation result from an explicit contract requirement and, therefore, are 'identified specifically with a particular final cost objective,' i.e., are direct costs . . ." (app. mot. at 27-28). It says that limiting the clause to transportation charged as a direct cost is the only way to give meaning to the clause's application to the transportation of "any supplies by sea under this contract."

Like the FAA clause, the text of the CPA clause refers to Lockheed's acts. Whenever Lockheed transports property clearly identifiable for eventual use by or owned by DOD under a contract containing the clause it must either comply with its requirement or seek relief. We are not convinced that transportation "under this contract" equates to "when the costs . . . result from an explicit contract requirement." For the reasons already given for the FAA clause, actions "under this contract" can include transportation not expressly discussed in the contract when bound up with complying with the contract's terms, conditions, or duties. Additionally, nothing in the CPA clause indicates it only applies to shipments identified with one final cost objective. Like the previously discussed FAA scenario, Lockheed might have shipped a set of materials by sea for eventual use by DOD solely under a series of contracts containing the clause, meaning multiple final cost objectives. There is no basis to disregard the clause's performance requirements because Lockheed has identified the shipping cost with more than one contract, or an intermediate cost pool, and charged it indirectly. Lockheed's obligations under the CPA clause are unrelated to how it

11

charges for its services.  Nor would that conclusion change if some subset of the contracts associated with a shipment were not with the government.  If the shipment includes supplies as defined by the clause transported for a contract containing the clause, then compliance is necessary.

Lockheed suggests this conclusion leads to absurd results.  It says it routinely ships materials that are not identified with any project, contract, or customer.  It maintains that if the CPA clause applied to costs charged indirectly, it would apply to these types of shipments. (App. mot. at 26)  In addition to the fact Lockheed fails to support that assertion, we do not see why a shipment of material legitimately not identified with any contract and customer at the time of transportation falls within the CPA clause's U.S.-flag vessel performance requirement.  We also do not share Lockheed's belief that it must be relieved from complying with the CPA clause for all shipments that it charges as indirect costs or all its subcontractors' sea transportation will be subject to the clause, regardless of connection to DOD contracts (app. mot. at 29).  Like Lockheed itself, its subcontractors' compliance with the clause is governed by their actions, particularly what they are shipping under the subcontract.

Lockheed's additional contentions that paragraphs (c) through (g) compel excluding shipments charged indirectly from the clause's application are not persuasive either.  Paragraphs (c) and (d) provide Lockheed an avenue to seek foreign-flag authorization for shipments that otherwise would have to go on a U.S.-flag vessel (meaning transportation of property clearly identifiable for eventual use by or owned by DOD under a contract containing the clause) when a U.S.-flag vessel is unavailable, freight charges would be excessive or unreasonable, or are higher than charges to private persons for like goods.  The request must be submitted at least 45 days prior to the necessary sailing date and will be processed as expeditiously as possible.  DFARS 252.247-7023(c)-(d).  Lockheed suggests this procedure is impractical if it applies to shipping billed indirectly because it might require submittal of requests to multiple contracting officers if more than one contract is involved.  It asserts without support that would generate unreasonable delay.  (Tr. 30-53)  Notably, though the clause requires that processing of a waiver request proceed expeditiously, it bars compensation for delay in the event approval is not granted in time to meet the shipping date.  DFARS 252.247-7023(d).  We conclude the time it takes to process CPA waiver requests and the number of contracting officers necessary to do it has no bearing upon the scope of the CPA performance requirement for which a waiver might be sought.

Paragraph (e) requires Lockheed to submit a bill of lading after each shipment covered by the clause, to include the contract number and a description of the commodities.  DFARS 252.247-7023(e).  Lockheed says this is overly burdensome if it applies to its entire ocean transport, or impossible if there is no contract number to provide (app. mot. at 30).  Lockheed proffers no evidence to support its claim of

burden. Moreover, that is not a basis to ignore the clause's plain language. Anyway, we also reject this argument's premise. Paragraph (e) does not apply to all of Lockheed's ocean transport. It applies to shipments covered by the clause, meaning property clearly identifiable for eventual use by or owned by DOD at the time of transport under a contract containing the clause. Also, though Lockheed has not provided a reason, or evidence, as to why such transport could not be identified with a contract number, to the extent it truly cannot, that is not a ground to limit the CPA clause only to shipments it bills directly. At most, it might be an excuse to substitute other identifiable information.

Paragraph (f) is restricted to contracts exceeding the simplified acquisition threshold and requires reporting. Lockheed's final contract invoice is to represent to the best of its knowledge that either no ocean transportation was used in performance, only U.S.-flag vessels were used for all ocean shipments, the contracting officer consented to all foreign-flag ocean transportation, or some or all ocean transportation was on foreign-flag vessels without contracting officer consent. If the latter, Lockheed's description of the shipments must include item description, contract line items, and quantity. DFARS 252.247-7023(f). Unauthorized use of foreign-flag vessels in the performance of the contract entitles the contracting officer under paragraph (g) to equitably adjust the contract. DFARS 252.247-7023(g). Lockheed contends that because it charges for shipping indirectly, should it disregard the clause and ship supplies on foreign-flag vessels without contracting officer consent, it cannot provide the information required by paragraph (f) because it cannot link transported supplies to particular contract line items. Additionally, it says the government cannot equitably adjust a contract whose terms are violated through conduct billed indirectly through cost rates. (App. mot. at 31-32) Lockheed suggests that because the government cannot obtain the remedies provided by paragraphs (f) and (g) if it violates the clause and then bills indirectly, it should be relieved from abiding by the clause's performance obligation entirely.

Lockheed's problems, whatever they may be, complying with paragraph (f) because of its cost treatment do not excuse fulfilling the CPA clause's performance requirements. Furthermore, Lockheed has not proffered evidence showing that indirectly billing the government for shipping prevents it from knowing what it ships, or what contracts the shipments are for. It has not explained why it cannot track transported property identifiable for eventual use by or owned by DOD under its contracts. Finally, Lockheed has not demonstrated that it is impossible to apply an equitable adjustment to contracts violated through conduct billed indirectly. As the government seeks to do here, if Lockheed has invalidly included in its calculation of indirect billing rates the cost of unauthorized foreign-vessel shipping, presumably the rates can be adjusted to account for it, which essentially adjusts the price.

13

We deny Lockheed's request for a categorical ruling that the performance requirements of the FAA and CPA clauses do not apply to international shipping activities it has charged as indirect costs.

## II.    The Government's Motion

The government's cross motion for summary judgment asks us to rule the government properly determined that Lockheed violated the terms of the FAA and CPA clauses when shipping materials.  Thus, it correctly treated those shipping costs as unallowable under FAR 31.201-2(a)(4), which, among other things, conditions cost allowability on compliance with contract terms.  The government's motion baldly declares, without providing supporting evidence, that Lockheed shipped cargo by foreign air carrier in breach of the FAA clause (gov't mot. at 8; gov't December 6, 2024, sur-reply at 5 (sur-reply 1)).[6]  It says Lockheed "transported cargo in performance of the Representative Contract, as well as other Government contracts" and that "it cannot be disputed that Lockheed failed to comply with its contract terms including [the FAA clause] in the transportation of this cargo" (gov't mot. at 10).  Similarly, the government alleges, without citation in support, that "Lockheed shipped clearly identifiable supplies on foreign vessels" during the relevant fiscal years "without obtaining prior approval," again in breach of contract (gov't mot. at 36-37, sur-reply 1 at 24).  The government's sur-reply repeats, without support, that "Lockheed's actions demonstrate noncompliance with the contract terms, FAR 52.247-63 and DFARS 252.247-7023, by shipping items via foreign carriers without the requisite justification . . ." (sur-reply 1 at 3).  It closes by proclaiming without citation that "[t]he undisputed facts unequivocally demonstrate Lockheed violated" the FAA and CPA clauses and that "[t]here is no genuine issue of material fact regarding Lockheed's failure" (sur-reply 1 at 6).  But Lockheed makes it clear in its opposition brief that it disputes the government's factual allegations (app. opp. at 24).

The government can only receive summary judgment if it establishes the absence of any genuine issues of material fact and it is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in the opposing party's favor." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998).  The government must support an assertion that a fact cannot be genuinely disputed by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(C)(1)(A); *see also* Board Rule 7(c)(2) (requiring a party to "support by specific evidence all facts and legal arguments necessary to sustain a party's position" by citing to the record or additional attached evidence).

---

[6] The government filed two briefs in support of its motion that it titled "sur-reply," one dated December 6, 2024, and the other dated December 20, 2024.

The government's motion cites no evidence in the record showing that in performing work under a contract containing the FAA clause Lockheed used a foreign flag air carrier for international air transportation of property. Likewise, its motion cites no evidence that Lockheed transported by sea property clearly identifiable for eventual use by or owned by DOD under a contract containing the CPA clause on a foreign-flag vessel without authorization. And it certainly fails to show that all of DCMA's determinations of violations were accurate.[7]

The government suggests that it has carried its summary judgment burden by referring to conclusory statements in its audit reports that Lockheed did not comply with the clauses, stressing their assertions that Lockheed never explained its conduct or provided proof of authorization to deviate (gov't mot. at 7-8, 37; sur-reply 1 at 4-6 (citing R4, tabs 22, 29, 32)). In addition to the fact that the reports' authors do not declare personal knowledge of facts, they fail to identify any contracts or present any factual description that would tend to indicate violation of the clauses (R4, tabs 22, 29, 32).

After insisting it has unequivocally demonstrated Lockheed's breach of the clauses, the government's sur-reply does a complete reversal and proceeds to deny it has the burden of proving anything. Instead, it suggests Lockheed must prove to us its costs were allowable because the clauses place upon it the burden of justifying departure from their U.S.-flag requirements (sur-reply 1 at 7-9). That argument just assumes Lockheed has used foreign transportation in contravention of the clauses, which the government has not shown. To be clear, these are government claims premised upon the allegation that Lockheed has based its indirect cost rates upon amounts incurred in breach of its contracts. The law is well established that the government must prove that costs are unallowable. *See Parsons-UXB Jt. Venture*, ASBCA No. 56481, 13 BCA ¶ 35,378 at 173,598. That is especially the case here because a party claiming breach of contract bears the burden of proof. *Glasgow Assocs. v. United States*, 495 F.2d 765, 768 (Ct. Cl. 1974); *Mylene Will Co.*, ASBCA No. 58154, 13 BCA ¶ 35,415 at 173,749.

The government makes a last attempt at burden shifting through a notification of the recent ruling in *Lessors of Abchakan Village v. Secretary of Defense*, 137 F.4th

---

[7] The government's sur-reply refers to a series of documents that might constitute invoices of materials shipped by Lockheed (sur-reply 1 at 5 (citing R4, tabs 51-53)). In addition to being too late to support its motion, the presentation is inadequate. It supplies no explanation of the documents, makes no effort to authenticate them or demonstrate the referenced carriers are foreign-flag, and does not link the purported shipments to the performance of contracts containing the clauses.

1301 (Fed. Cir. 2025). In that claim for unpaid rent, the court of appeals explained that we correctly placed the burden of proving ownership of the leased land on the claimants, noting as a practical matter that when one party has superior access to evidence needed to prove a fact that party should bear the burden of proof. *Abchakan Village,* 137 F.4th at 1310. The government suggests this decision reorders the placement of burdens. Regardless of what the law may have been, now Lockheed must disprove the government's claims because Lockheed has better knowledge of its contract performance than the government. We decline to hold that *Abchakan Village* announces such a radical departure from well-settled law. There is nothing new or revolutionary about the superior access doctrine applied in the circumstances of that decision. *See generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-60 (2005) (recognizing the ordinary default rule that claimants bear the burden of persuasion regarding the essential aspects of their claims may not apply to establishing facts peculiarly within the knowledge of their adversaries). *Abchakan Village* gives no indication that it is intended as a comprehensive displacement of established burden of proof precedent such as what applies here, which is that the party claiming breach of contract bears the burden of proof.[8] We are unaware of any reason the government would be impeded from meeting its burden in this case if the evidence supports its claims. The government has already had access to Lockheed's records through audits and concluded it had sufficient evidence to prove formal monetary claims that Lockheed has breached its contracts by violating the clauses. For whatever reason, it has failed to present adequate evidence of those claims to support summary judgment, pressing a meritless contention that it need not do so. Accordingly, we deny its motion.

CONCLUSION

The cross motions for summary judgment are denied.

Dated: March 10, 2026

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[8] Indeed, the government's suggestion is surprising given that most breach claims brought here are against it.

16

I concur                                          I concur


_____                  _____
J. REID PROUTY                                    MICHAEL N. O'CONNELL
Administrative Judge                              Administrative Judge
Acting Chairman                                   Vice Chairman
Armed Services Board                              Armed Services Board
of Contract Appeals                               of Contract Appeals


        I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 63621, 63622, 63671,
63697, 63698, 63742, Appeals of Lockheed Martin Aeronautics Company, rendered in
conformance with the Board's Charter.

        Dated:  March 10, 2026


                                _____
                                PAULLA K. GATES-LEWIS
                                Recorder, Armed Services
                                Board of Contract Appeals

17